# COURT OF APPEALS OF VIRGINIA

## Record No. 0227-25-4

ISAIAH GERSHON MCGRIFF

v.

COMMONWEALTH OF VIRGINIA

Present: Judges AtLee, Friedman and Senior Judge Annunziata
Argued at Alexandria, Virginia

Opinion Issued June 30, 2026[*]

## FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
### Robert P. Coleman, Judge

Collin Chayce Crookenden (Vanderpool, Frostick & Nishanian, P.C., on brief), for appellant.

Lindsay M. Brooker, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## <u>JUDGE ROSEMARIE ANNUNZIATA</u>

A jury convicted Isaiah Gershon McGriff of second-degree murder and using a firearm in the commission of a felony. On appeal, McGriff argues that the trial court gave an improper "*Allen* instruction"[2] after the jury stated it was "evenly divided." He also challenges the sufficiency of the evidence to prove he was the perpetrator. Finding no error, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] In *Allen v. United States*, 164 U.S. 492, 501-02 (1896), the United States Supreme Court held that the trial court did not err by instructing the jurors, after they returned to the court to ask for further instruction, to continue their deliberations with the aim of reaching a verdict by reevaluating their opinions and those of their fellow jurors without giving up their own conscientious belief. It stated that although "the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the juryroom." *Id.* at 501.

BACKGROUND[3]

On July 1, 2022, a Prince William County police officer went to a 7-Eleven store in response to a 911 call reporting a homicide at around 4:30 a.m. Only one man was in the 7-Eleven parking lot, which was unusual at that store for that time of morning. The man denied that he had called 911 but pointed to a wooded area near the convenience store, referred to as "the jungle," and told the officer, "She's up there. Get her an ambulance." The officer walked into the wooded area and found Claudia Morataya's body; Morataya had been shot once in the torso. He checked for vital signs, but Morataya was dead. Police found an empty cartridge case about 20 feet from the body.

Surveillance video from the 7-Eleven recorded events before the shooting but not the killing itself. The video depicted several people at the side of the 7-Eleven near a path leading toward the wooded area. Morataya argued with someone, smashed a skateboard on the ground in front of Malachi Walker, and threw a bottle at a car windshield. She then "took a good swing" at a man before an unidentified person shoved her to the ground.

Brian Briggs and Elizabeth Mentzer tried to calm Morataya. Briggs grabbed her to "corral her." Then, Briggs and Mentzer walked her down the path toward the woods. A short time later, "numerous" people ran out of the woods. Based on the time of the 911 call reporting the homicide, officers believed this was when Morataya was shot.

---

[3] On appeal, we review the evidence "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Later that day, police received a tip from an informant that a person nicknamed "Wiz" was the shooter. Law enforcement databases indicated that "Wiz" was McGriff's nickname. The informant also told police that "Wiz" resided at an apartment building near the 7-Eleven.

While surveilling the apartment building, police saw McGriff leave but could not tell which apartment he came from. A car arrived in the building's parking lot, and McGriff approached the driver's side. The police approached, detained McGriff, and seized his cellphone.

Recovered data from the phone showed that the user visited a link to an article about Morataya's killing. Text messages from the phone identified the sender as "Wiz." Other messages read, "From: [identifying numbers] Isaiah McGriff." On the night of the killing, the user had responded to a message by saying he was at "the jungle." The next day, the writer stated in a message that he was at his "crib" across from the 7-Eleven. Later, the user wrote, "[t]he Jungle is shut down[.] Claudia got killed [back] there."

Officers executed a search warrant at the apartment and discovered and seized a firearm and a magazine. The firearm had been hidden in a powdered protein jar. During the search, officers found documents identifying McGriff. Subsequent forensic analysis revealed that McGriff's DNA was on the gun in several locations. And the cartridge casing found at the crime scene had been fired from the gun seized at McGriff's apartment.

Officers interrogated McGriff after he was arrested. He told the officers that he slept behind a different 7-Eleven on the night of the shooting. He claimed he had not been at the 7-Eleven near "the jungle" since the Monday or Tuesday before the shooting. He stated that the apartment the police searched belonged to "his people" and that he kept his clothes there.

McGriff maintained that the only gun he had ever bought and possessed was a nine-millimeter firearm, which he later forfeited. The officers confronted McGriff about an

incident several months before the killing during which he told police that he owned and possessed a .380 caliber gun, a gun with the same serial number as the one officers recovered during their search of the apartment. In the earlier interview, McGriff had told police that he could produce a bill of sale for the .380 caliber gun and that he had a concealed carry permit. But McGriff denied to the interrogating officers that he had previously told police that he owned a .380 caliber gun. He stated that he only remembered telling police that he "had" the gun at the time. Further, he told them that he had not possessed the gun for "a month or two" before Morataya's killing.

At trial, Walker and Mentzer testified that "Wiz" and Morataya were at the 7-Eleven on the night of the shooting. Walker admitted that he was "high" at the time, having consumed "a lot" of fentanyl. Mentzer admitted that she had consumed both alcohol and fentanyl and was "heavily influenced" by substances that night.

Video from an apartment neighbor's doorbell camera showed McGriff and two other men descending the apartment building's stairs at around 4:14 a.m. on the morning of the shooting. McGriff and the others walked back up the stairs past the camera at about 4:36 a.m. The 911 caller reported the killing at around 4:25 a.m. The apartment building is "about a quarter of a mile" away from the 7-Eleven.

Detective Darien Cupka identified several figures seen on the 7-Eleven surveillance footage, including Morataya, Walker, and Mentzer. He did not identify McGriff in the video, but some figures were unidentifiable because their faces were not visible. He testified without objection that witnesses told police that Morataya argued with McGriff the night she was killed and that she threw a bottle at McGriff's face. Detective Cupka also testified about the cartridge case found near Morataya's body and firearm found at the apartment. He described the unique "head stamp" on the casing, which read "RIP."

- 4 -

Officer Thomas Squire testified that he was one of the officers who went to an incident at a motel several months before the killing, when McGriff told officers that he owned a .380 caliber firearm. Officer Squire took photos of the .380 caliber handgun in McGriff's possession and the loaded magazine. Detective Cupka confirmed that Officer Squire's photos depicted the same handgun recovered from the apartment as well as "RIP" cartridge casings in the loaded magazine that matched the casing found at "the jungle."

McGriff moved to strike at the close of the Commonwealth's case-in-chief. He argued that the evidence did not identify him as the shooter. The Commonwealth noted that the bullet casing found at the scene of the killing was shot from the firearm officers seized during their search of the apartment, that McGriff had told police he owned that same firearm several months earlier, and that he was a major contributor to the DNA profile recovered from the weapon. The Commonwealth also pointed to the facts that witnesses placed him at the scene of the killing and that text messages sent from his phone identified the user as "Wiz," the name an informant gave police officers for Morataya's killer. The court denied the motion.

After around two hours of deliberation, the jury sent a note to the trial court stating, "We took a vote and are evenly divided. Where do we go from here?" The court considered whether it was appropriate to give the jury a federal *Allen* charge based on the jury's question. It stated that the federal *Allen* instruction "is more comprehensive" than the Virginia *Allen* charge.[4] McGriff objected to giving any *Allen* instruction but requested that the court give the jury the

---

[4] Although the circuit court stated that it used "the Federal *Allen* Charge," the instruction the trial court gave the jury is an amalgam of principles and phrases found in various model *Allen* instructions in the federal circuits. *See* Sixth Circuit Pattern Jury Instruction 9.04 ("If you cannot agree, and if this case is tried again, there is no reason to believe that any new evidence will be presented or that the next twelve jurors will be any more conscientious and impartial than you are."); Eighth Circuit Criminal Model Jury Instruction 10.02 ("In the course of your deliberations you should not hesitate to re-examine your own views, and to change your opinion if you are convinced it is wrong."). Simply put, there is not a federal *Allen* instruction, and we do not adopt the instruction the trial court gave.

Virginia *Allen* instruction if it decided to proceed. Defense counsel maintained that the jury had been properly instructed so he had no suggested answer to the jury's question.

The court gave the jury the following instruction:

> The [c]ourt wishes to suggest a few thoughts to you which you may wish to consider in your deliberations. You should consider these thoughts, along with the evidence received during the trial and all of the instructions previously given to you.
>
> This is an extremely important case. If you should fail to agree on a verdict, the case is left open and undecided.
>
> There appears to be no reason to believe that the case will be presented again by either side better or more exhaustively than it has been presented to you.
>
> Any future jury would be selected in the same manner and from the same source as you were chosen. There appears to be no reason to believe that the case could ever be submitted to 12 people more conscientious, more impartial, or more competent to decide it, or that more or clearer evidence could be produced on behalf of either side.
>
> You should not surrender your honest belief as to the weight or [e]ffect of evidence solely because of the opinion of other jurors or for the mere purpose of reaching a[] unanimous verdict.
>
> It is your duty as jurors, however, to consult with one another and to deliberate with a view towards reaching an agreement, if you can do so without violence to individual judgment.
>
> Each of you must decide the case for yourself, but you should do so only after a consideration of the evidence in the case with your fellow jurors.
>
> In the course of your deliberations, you should not hesitate to re-examine your own views and change your opinion, if you are convinced it is uranous [sic].
>
> In order to bring 12 minds to an unanimous result, you must examine the question submitted to you with candor and frankness, and with proper deference to and regard for the opinions of each other.
>
> That is to say, in conferring together, each of you should pay due attention and respect to the views of the others and listen to each

other[']s arguments with a disposition to re-examine your own views.

If a much greater number of you are for one verdict, a dissenting juror ought to consider whether his or her position is a reasonable one, since it is not shared by so many equally honest and conscientious fellow jurors who bear the same responsibility, serve under the same oath, and have heard the same evidence with, we may assume, the same attention and equal desire to arrive at the truth.

You are not partisans. You are judges of the facts of the case. Your sole interest here is to determine whether the Commonwealth has proven each and every element of the offenses beyond a reasonable doubt.

You are the exclusive judges of the credibility of all of the witnesses and the weight and value of all of the evidence.

Remember at all times that no juror is expected to yield a conscientious belief that he or she may have as to the weight or the [e]ffect of the evidence, but remember also that after full deliberation and consideration of all the evidence in the case, it is your duty to agree upon a verdict, if you can do so without violating your individual judg[]ment and your conscience.

You may conduct your deliberations as you choose, but I suggest that you now carefully re-examine and reconsider all of [the] other evidence in the case bearing on the questions before you, in light of the [c]ourt's instructions on the law.

The jury subsequently convicted McGriff of both charges. McGriff appeals.

ANALYSIS

I. *Allen* Instruction

The appellate court reviews a decision whether to give a jury instruction for an abuse of discretion. *Drexel v. Commonwealth*, 80 Va. App. 720, 742 (2024). A court may give a jury an *Allen* instruction "when jurors have announced their inability to agree [on a verdict] . . . to urge on them an earnest effort to reach an agreement." *Id.* at 746 (quoting *Poindexter v. Commonwealth*, 213 Va. 212, 215 (1972)). A proper *Allen* charge "encourag[es] each juror to reconsider and listen to the conclusions of the other jurors in order to reach a unanimous verdict." *Id.* at 746 n.8. The

trial court may "remind[] the jury of the need to reach a verdict if one can be reached without any individual juror giving up his or her conviction." *Id.* at 746 (alteration in original) (quoting *Prieto v. Commonwealth*, 278 Va. 366, 387 (2009)).

McGriff maintains that the circuit court erred by giving the jury an *Allen* instruction. Particularly, McGriff argues that the court gave the jury the *Allen* instruction too early in its deliberations and that the federal *Allen* instruction the court gave was coercive.[5]

There is no brightline rule establishing that a jury must deliberate for a certain amount of time before an *Allen* instruction is appropriate. Rather, whether and when to give the instruction is discretionary, and the court may give such an instruction after the jury "announce[s]" that they cannot attain a verdict. *Id.* at 746. A jury need not explicitly "declare an *inability* to agree" before a court may give an *Allen* instruction. *Id.* at 747 (emphasis added). Indeed, we have held that a court did not abuse its discretion by giving an *Allen* instruction after the jury deliberated for "about seven hours" before sending a note that read, "What do we do if we cannot come to unanimous agreement? That is the stance of the jury at this time." *Id.* at 745-47.

Here, the court gave the jury its *Allen* instruction after it had deliberated for around two hours, informed the court they were "evenly divided," and asked for further instruction. The jury's

_____

[5] The Commonwealth asserts that McGriff waived several arguments under Rule 5A:18 because he did not present them in the circuit court. McGriff objected to the proposed *Allen* instruction immediately after the circuit court acknowledged that it may have been early to give the jury such an instruction but that it was "very clear that they are evenly divided." Defense counsel stated that McGriff objected to an *Allen* instruction "at this time or at any time during the course of the trial." Defense counsel also argued against giving the jury any *Allen* instruction on the ground that they are coercive. Counsel suggested that the jury had been adequately instructed and that if the court proceeded to give an *Allen* instruction, it should use the Virginia *Allen* model instruction rather than the federal model instruction the court used. Accordingly, these arguments are preserved.

McGriff now argues that the trial court erred by representing that there is only one federal *Allen* instruction, and he points to language in other federal model *Allen* instructions that he finds less coercive. McGriff did not suggest to the trial court that it use any *Allen* instruction other than the Virginia model instruction, so these arguments are not preserved.

note did not explicitly declare an inability to reach a verdict, but its import was the same: the jury was deadlocked, and it sought direction from the court on "[w]here" to "go from here." Under those circumstances, the trial court did not abuse its discretion by answering the jury's explicit question with an *Allen* instruction even though the jury had been deliberating for only two hours.

Further, the instruction that the court ultimately gave the jury was not coercive, as each charge to reevaluate the evidence was balanced with an admonition that no juror should "surrender [their] honest belief as to the weight or [e]ffect of evidence solely because of the opinion of other jurors or for the mere purpose of reaching a[] unanimous verdict." *See Prieto*, 278 Va. at 387 (the purpose of an *Allen* instruction is to "remind[] the jury of the need to reach a verdict *if* one can be reached without any individual juror giving up his or her conviction" (emphasis added) (quoting *Poindexter*, 213 Va. at 215)). The court reiterated that the jurors had a duty to agree upon a verdict *provided* they did not violate their "individual judg[]ment and . . . conscience."

The court also reminded them that any future jury that would hear the case at another trial "would be selected in the same manner and from the same source as [they] were chosen," that "the case will [not] be presented again by either side better or more exhaustively than it has been presented to you," and that if the jury failed "to agree on a verdict, the case is left open and undecided." The instruction did not coercively outweigh the clear direction that each juror should honor his or her individual conscience. Rather, considered as a whole, the instruction cogently embodied the purpose of an *Allen* instruction—"to balance fairness to the accused against the time and expense of trial and 'the fact that in the event of a disagreement the case will [likely] have to be decided by some [other] jury . . . on the same evidence.'" *Bennett v. Commonwealth*, 84 Va. App. 607, 625 (2025) (alterations in original) (quoting *Poindexter*, 213 Va. at 215).

The jury's note indicated that it had reached an impasse and sought further direction from the court. The court's instruction was not coercive and properly reflected the purpose of an *Allen* charge. Therefore, the court did not abuse its discretion in giving the instruction.

II. Sufficiency of the Evidence

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

The only relevant question for this Court on review "is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

McGriff argues that the Commonwealth did not prove that he killed Morataya or that he shot her. He claims that, although some evidence showed that "Wiz" was the killer, the Commonwealth did not prove that he is "Wiz." Further, he maintains that he did not send the messages from "Wiz" on his phone, he was not at the 7-Eleven or "the jungle" on the night of the killing, and that the evidence does not prove that he used the murder weapon to shoot Morataya.

To begin, an informant told police that "Wiz" killed Morataya. Mentzer and Walker testified that "Wiz" was at the 7-Eleven on the night of the shooting. And although both Mentzer and Walker admitted that they were intoxicated that night, we must defer to the jury's determination of their credibility. *See Welch v. Commonwealth*, 79 Va. App. 760, 767 (2024) ("Determining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the opportunity to observe the demeanor the witnesses as they testify." (alterations in original) (quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 526 (2015))). Neither Mentzer nor Walker identified McGriff as "Wiz," but messages on McGriff's cellphone stated that the sender was "Wiz." In other messages on the phone, the user is McGriff. And law enforcement databases identified "Wiz" as McGriff's alias.

The Commonwealth's evidence also established McGriff's presence near "the jungle" at the time of the killing and his possession of the murder weapon. To prove identity, the Commonwealth must show "that motive, time, place, means, and conduct concur in pointing out the accused as the perpetrator of the crime." *Commonwealth v. Paxton*, 304 Va. 298, 308 (2025) (quoting *Inge v. Commonwealth*, 217 Va. 360, 366 (1976)). "It is firmly established that '[c]ircumstantial evidence is competent and is entitled to as much weight as direct evidence provided that the circumstantial evidence is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Kelley v. Commonwealth*, 69 Va. App. 617, 629 (2019) (alteration in original) (quoting *Pijor*, 294 Va. at 512). Doorbell camera footage from a neighboring apartment showed McGriff and others leaving the building around the time of the killing and returning a short time later.

Messages from McGriff's phone showed that the user knew that Morataya had been killed and that, after the killing, the user was at the apartment where McGriff kept his belongings, and where police arrested him. When police searched the apartment they found a .380 caliber firearm that contained McGriff's DNA. Forensic analyses determined that the cartridge casing found at "the

jungle" was fired from the firearm. And the firearm was associated with the distinctive "RIP" stamp found on the casing near Morataya's body. When viewed collectively, these circumstances permitted the jury to conclude that McGriff was the shooter. *See Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (explaining that the "combined force of many concurrent and related circumstances" may prove guilt (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005))).

Moreover, it is well-established that "[i]n drawing inferences from the evidence, the fact finder may conclude regarding even a non-testifying defendant that his false statements establish that he lied to conceal his guilt." *Williams v. Commonwealth*, 71 Va. App. 462, 484 (2020). McGriff made several claims to police that were inconsistent or contradicted by other evidence. For example, he told officers that he spent the night of the murder asleep behind *another* 7-Eleven, but the doorbell camera footage showed him leaving and returning to the apartment on the night of the killing. On the night of the killing, the user of McGriff's phone stated that he was at the "Jungle" when asked, "U at the 711?" Witnesses also told investigators that Morataya fought with McGriff that night and threw a bottle at him. All of those circumstances undermined McGriff's claim that he was at a different 7-Eleven on the night of the shooting. Further, McGriff told investigators that he did not own a .380 caliber gun. But only a few months before the killing he told police that he possessed and could produce a bill of sale for a .380 caliber firearm.

Finally, McGriff contends that it was possible that "Wiz" was a "friend or close acquaintance" who used his phone. Although McGriff could offer alternative explanations, "the Commonwealth need only exclude reasonable hypotheses that flow from the evidence, not those that spring from the imagination of the defendant." *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004) (quoting *Hamilton v. Commonwealth*, 16 Va. App. 751, 755 (1993)). Considering the other evidence placing McGriff at the scene of the killing and his inconsistent statements to police, it was reasonable for the jury to conclude that McGriff authored the messages sent from "Wiz." *See*

- 12 -

*Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017) (record supported trial court's finding that defendant authored statements in text messages where the defendant conceded that the seized phone belonged to him and accounts linked to the phone used defendant's name).

The jury could reasonably conclude that McGriff was "Wiz," that he was present at the 7-Eleven and "the jungle" the morning of the killing, and that he possessed and used the firearm recovered from the apartment to shoot Morataya. The evidence was sufficient for a rational fact finder to identify McGriff as the perpetrator beyond a reasonable doubt. Accordingly, we will not disturb the jury's verdict.[6]

CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.[7]

*Affirmed.*

---

[6] To the extent McGriff argues that he did not "intentionally" kill Morataya, that argument is not preserved under Rule 5A:18.

[7] McGriff withdrew his assignment of error alleging that the court abused its discretion by allowing the Commonwealth to elicit testimony from witnesses who were not timely named in its witness list.